IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF IOWA
CEDAR RAPIDS DIVISION

RONALD A. PERKINS,

Plaintiff,

vs.

CAROLYN W. COLVIN,
Commissioner of Social Security,

Defendant.

No. C14-0095

RULING ON JUDICIAL REVIEW

## TABLE OF CONTENTS

I.   INTRODUCTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

II.  PROCEDURAL BACKGROUND . . . . . . . . . . . . . . . . . . . . . . . 2

III. PRINCIPLES OF REVIEW . . . . . . . . . . . . . . . . . . . . . . . . . . 3

IV.  FACTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5
     A.   Perkins' Educational and Employment Background . . . . . . . . . . . 5
     B.   Administrative Hearing Testimony . . . . . . . . . . . . . . . . . . 5
          1.   Ronald Perkins' Testimony . . . . . . . . . . . . . . . . . . . . 5
          2.   Vocational Expert Testimony . . . . . . . . . . . . . . . . . . . 8
     C.   Perkins' Medical History . . . . . . . . . . . . . . . . . . . . . . . 9

V.   CONCLUSIONS OF LAW . . . . . . . . . . . . . . . . . . . . . . . . . 14
     A.   ALJ's Disability Determination . . . . . . . . . . . . . . . . . . . 14
     B.   Objections Raised by Claimant . . . . . . . . . . . . . . . . . . . 17
          1.   Credibility Determination . . . . . . . . . . . . . . . . . . . 17
          2.   Opinion of Consultative Examiner, Dr. Robin Epp . . . . . . . 23

VI.  CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

VII. ORDER . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

## I. INTRODUCTION

This matter comes before the Court on the Complaint (docket number 1 ) filed by Plaintiff Ronald A. Perkins on August 19, 2014, requesting judicial review of the Social Security Commissioner's decision to deny his application for Title II disability and Title XVI supplemental security income ("SSI") benefits. Perkins asks the Court to reverse the decision of the Social Security Commissioner ("Commissioner") and order the Commissioner to provide him disability insurance benefits and SSI benefits. In the alternative, Perkins requests the Court to remand this matter for further proceedings

## II. PROCEDURAL BACKGROUND

Perkins filed his applications for disability benefits and SSI benefits on December 8, 2010. Perkins claimed that he has been disabled since December 31, 2008 due to left knee pain, left heel pain, low back pain, and fainting spells. The Social Security Administration ("SSA") denied both applications on April 21, 2011, and denied them again, on Perkins' request for reconsideration, on July 7, 2011.

Perkins timely requested an administrative hearing on August 2, 2011. On September 17, 2012, Administrative Law Judge ("ALJ") Tela L. Gatewood held a video hearing, and Perkins appeared with his attorney, Jeffrey Berg.[1] Perkins and a vocational expert, Carma A. Mitchell, testified at the hearing. The ALJ issued a decision on March 8, 2013, finding Perkins was not disabled as defined in the Social Security Act.

On May 6, 2013, Perkins timely appealed the ALJ's decision. On June 18, 2014, the Appeals Council denied Perkins' request for review, and the SSA held the ALJ's decision as the final decision of the Commissioner.

On August 20, 2014, Perkins initiated this action, seeking judicial review of the Commissioner's final decision. On October 20, 2014, both parties consented to proceed

---

[1] Perkins appeared via video from Cedar Rapids, Iowa. The ALJ appeared in West Des Moines, Iowa.

before a magistrate judge for final disposition in accordance with 28 U.S.C. § 636(c). On December 4, 2014, the Commissioner filed an Answer. On January 7, 2015, Perkins filed a brief, arguing there is substantial evidence on record showing he has been disabled from December 31, 2008 to the time of the ALJ's decision. On March 4, 2015, the Commissioner filed a responsive brief, asserting the ALJ did not err in her decision finding Perkins is not disabled. Perkins filed a reply brief on March 16, 2015.

### III. PRINCIPLES OF REVIEW

Title 42, United States Code, Section 405(g) provides that the Commissioner's final determination following an administrative hearing not to award disability insurance benefits is subject to judicial review. 42 U.S.C. § 405(g). Pursuant to 42 U.S.C. § 1383(c)(3), the Commissioner's final determination after an administrative hearing not to award SSI benefits is subject to judicial review to the same extent as provided in 42 U.S.C. § 405(g). 42 U.S.C. § 1383(c)(3). Title 42 U.S.C. § 405(g) provides the Court with the power to: "[E]nter . . . a judgment affirming, modifying, or reversing the decision of the Commissioner . . . with or without remanding the cause for a rehearing." 42 U.S.C. § 405(g). "The findings of the Commissioner . . . as to any fact, if supported by substantial evidence, shall be conclusive . . ." *Id.*

The Court will "affirm the Commissioner's decision if supported by substantial evidence on the record as a whole." *Anderson v. Astrue*, 696 F.3d 790, 793 (8th Cir. 2012) (citation omitted). Substantial evidence is defined as "'less than a preponderance but . . . enough that a reasonable mind would find it adequate to support the conclusion.'" *Id.* (quoting *Jones v. Astrue*, 619 F.3d 963, 968 (8th Cir. 2010)); *see also Brock v. Astrue*, 674 F.3d 1062, 1063 (8th Cir. 2010) ("Substantial evidence is evidence that a reasonable person might accept as adequate to support a decision but is less than a preponderance.").

In determining whether the decision of the ALJ meets this standard, the Court considers "all of the evidence that was before the ALJ, but it [does] not re-weigh the

evidence." *Vester v. Barnhart*, 416 F.3d 886, 889 (8th Cir. 2005) (citation omitted). The Court not only considers the evidence which supports the ALJ's decision, but also the evidence that detracts from his or her decision. *Perks v. Astrue*, 687 F.3d 1086, 1091 (8th Cir. 2012); *see also Cox v. Astrue*, 495 F.3d 614, 617 (8th Cir. 2007) (Review of an ALJ's decision "extends beyond examining the record to find substantial evidence in support of the ALJ's decision; [the court must also] consider evidence in the record that fairly detracts from that decision."). In *Culbertson v. Shalala*, 30 F.3d 934, 939 (8th Cir. 1994), the Eighth Circuit Court of Appeals explained this standard as follows:

> This standard is 'something less than the weight of the evidence and it allows for the possibility of drawing two inconsistent conclusions, thus it embodies a zone of choice within which the [Commissioner] may decide to grant or deny benefits without being subject to reversal on appeal.'

*Id.* (quoting *Turley v. Sullivan*, 939 F.2d 524, 528 (8th Cir. 1991), in turn quoting *Bland v. Bowen*, 861 F.2d 533, 535 (8th Cir. 1988)). In *Buckner v. Astrue*, 646 F.3d 549 (8th Cir. 2011), the Eighth Circuit Court of Appeals further explained that a court "'will not disturb the denial of benefits so long as the ALJ's decision falls within the available 'zone of choice.'" *Id.* at 556 (quoting *Bradley v. Astrue*, 528 F.3d 1113, 1115 (8th Cir. 2008)). "'An ALJ's decision is not outside that zone of choice simply because [a court] might have reached a different conclusion had [the court] been the initial finder of fact.'" *Id.* Therefore, "even if inconsistent conclusions may be drawn from the evidence, the agency's decision will be upheld if it is supported by substantial evidence on the record as a whole." *Guilliams v. Barnhart*, 393 F.3d 798, 801 (8th Cir. 2005) (citing *Chamberlain v. Shalala*, 47 F.3d 1489, 1493 (8th Cir. 1995)); *see also Wildman v. Astrue*, 596 F.3d 959, 964 (8th Cir. 2010) ("If substantial evidence supports the ALJ's decision, we will not reverse the decision merely because substantial evidence would have also supported a contrary outcome, or because we would have decided differently."); *Moore v. Astrue*, 572 F.3d 520, 522 (8th Cir. 2009) ("'If there is substantial evidence to support the Commissioner's

conclusion, we may not reverse even though there may also be substantial evidence to support the opposite conclusion.' *Clay v. Barnhart*, 417 F.3d 922, 928 (8th Cir. 2005).")

## IV. FACTS

### A. Perkins' Educational and Employment Background

Perkins was born in 1960. He graduated from high school and completed truck-driving school. Subsequently, he worked as a truck driver for approximately eight years. Perkins then held various temporary jobs, including work as an assembler, material handler, hand packager, packaging machine operator, and wire harness assembler. Perkins is not currently employed.

### B. Administrative Hearing Testimony

#### 1. Ronald Perkins' Testimony

At the administrative hearing, Perkins explained that his condition is the result of three main ailments: left knee pain, lower back pain and fainting spells. Perkins stated he believes that his left knee pain started as a result of a truck accident in 1995 and continued to worsen after he broke his heel in 2003. Rating the pain 9.5 out of 10 (10 being most severe pain), Perkins said his left knee swells regularly and, because he is overcompensating with his right leg, has now started affecting his right knee.[2] Perkins' attorney then questioned him about his functional capabilities:

> Q:    . . . How much activity would you have to have before it would start to swell?
> A:    Basically, sometimes none. I have trouble sleeping. I mean I can just --
> Q:    Does it swell just seating [*sic*], if you're just sitting all day?
> A:    Yeah. It gets real stiff, sometimes it's stiff and like we have stairs at home and when I go down the stairs, I can't just walk straight down the stairs. I got to like kind of turn sideways because the pressure, it just hurts

---

[2] Administrative Record at 48-50.

> and like it's just like going to lock up, when I go down
> the stairs.
>
> Q:    Have you-- has it given out on you or just collapsed?
> A:    Yes.  Yes.  Lately, we got the railing on the wall and
> I grab the railing.

(Administrative Record at 49.)  Perkins testified that he uses a cane, and he has been prescribed pain pills and muscle relaxers, although he is "leery" about taking them, because he is afraid of becoming addicted to pills.

Perkins' attorney also questioned him about his back pain:

> Q:    [When] was it that you had an injury to your low back?
> A:    Well, I know when I was growing up, I played football
> and I kind of had pain back then, but you know I just
> thought it was just a little something small.  And as I
> got older, it got worse and--
> Q:    How would you describe the pain?
> A:    About a 8 in my back.
> Q:    And where is it located, above your waist, below your
> waist?
> A:    It's below my waist.
> Q:    In the middle of your back?
> A:    My tailbone.
> Q:    So it's low then.
> A:    Yeah.
> Q:    Does it radiate down your back?
> A:    Like it kind of goes up my back sometimes and into my
> hips too...

(Administrative Record at 51.)  When asked if he had undergone an MRI or CT scan for his back pain, Perkins was at first unsure, stating that if he did, doctors had not diagnosed anything or recommended him for a particular procedure.

Perkins testified that he uses only Ben-gay, a heating pad and a back brace, all which help with the pain "periodically."[3]  He also attends physical therapy which, he

---

[3] Administrative Record at 51.

testified, sometimes aggravates his pain. When asked how this pain affects his ability to work, Perkins stated that every job he held requires "physical" work that he is not able to do anymore, further stating that sitting for long periods of time causes pain, requiring him to change positions constantly.

When asked about his fainting spells, Perkins testified that he has lost consciousness multiple times upon "exerting" himself. Perkins testified that his most recent incident was four months before the hearing, yet doctors were still unable to determine the cause, despite performing an EKG and having Perkins carry a heart monitor. According to Perkins, they are still investigating the cause, and he is currently taking pills for hypertension.

The ALJ questioned Perkins regarding his everyday activities. Perkins testified that his current condition prevents him from doing much of the work and activities he used to perform. He testified that he cares for pet cats, cooks, attempts to exercise by walking every night, and attends physical therapy in Iowa City. Up until his unemployment, Perkins also rode his bike for transportation. Perkins testified that he generally stays home and watches television; however, he does go to church and occasionally attends movies. Perkins also testified that he visited his children in Texas approximately two years prior.[4]

Finally, Perkins' attorney asked to what extent he believed he was capable of working:

> Q:  Do you think you'd have the stamina to work eight-hour days, five days a week?
> A:  No.
> Q:  And due to what reasons?
> A:  My knees and my back, they're not going to hold out. I mean I have trouble just sleeping and I know I couldn't be on my feet like that, you know because

---

[4] Administrative Record at 45-47.

there's the rigor of a regular day at any of these jobs in any warehouses.

(Administrative Record at 57-58.)

### 2. *Vocational Expert Testimony*

At the hearing, the ALJ asked vocational expert, Carma Mitchell, to assess the abilities of a hypothetical individual of Perkins' age, education, and work experience who could:

> Lift and/or carry, push and/or pull 25 pounds occasionally, 20 pounds frequently. . . . Stand and/or walk with normal breaks for six hours out of an eight-hour workday. . . . Sit with breaks for a total of six hours out of an eight-hour workday. . . . Climb, balance, stoop, crouch, kneel and crawl occasionally. . . . Would not be able to work at unprotected heights or around hazards. . . . Would not be able to use foot controls.

(Administrative Record at 60.) The vocational expert testified that taking these limitations into consideration, Perkins would be able to perform the following light, unskilled occupations: (1) mail clerk, (2) inserting machine operator, and (3) marker. The ALJ then added that the individual would not be able to work in temperature extremes, the vocational expert testified that the available positions in the jobs listed would not be affected. The vocational expert also testified that none of Perkins' skills from his prior employment would transfer to sedentary work.[5]

Perkins' attorney then asked the vocational expert whether an individual under the following limitations could perform full-time employment. He presented a hypothetical including the following limitations:

> Never crawl, kneel, walk uneven surfaces, use ladders, could only rarely, described as 10 percent or less of the time, stand, walk, stoop, bend or mount stairs and only occasionally sit.

---

[5] Administrative Record at 63.

(Administrative Record at 64.) The vocational expert testified that an individual under such limitations would only be able to perform less than full-time sedentary work. The attorney then asked if the same person would be "competitively employable" if "due to pain and/or problems with fainting spells [the individual] had to work at a slow pace up to a third of the workday. . . ." The vocational expert testified that under these limitations, an individual would not be able to hold competitive full-time employment in any position.[6]

## C. Perkins' Medical History

Perkins' relevant medical history began on October 14, 1995 when Perkins, then age 35, was involved in a truck accident and sustained injuries to his left leg. According to Dr. Fred Pilcher's records, Perkins underwent physical therapy through November 1995, and on December 7, 1995, he underwent anterior cruciate ligament reconstruction surgery. In March of 1996, Dr. Pilcher's progress notes conclude Perkins lost five to ten degrees of flexion, yet he was "happy" with his knee. He was ordered to continue therapy exercises and avoid heavy lifting; Dr. Pilcher noted, however, that Perkins' knee would not be permanently restrained.[7]

In May 2003, Perkins fractured his heel after falling down the stairs and reported experiencing tingling and burning sensations. X-rays showed Perkins sustained an intra-articular calcaneous fracture, and Dr. Jeffrey A. Mason ordered him to stay on crutches, bear no weight, and follow up with a specialist later that month. Upon follow-up on May 20, 2003, Dr. Hugh MacMenamin recorded that no other treatment would be beneficial at that time, noting Perkins would not obtain "satisfactory enough improvement" from

---

[6] Administrative Record at 64.

[7] Administrative Record at 306-313.

"open reduction and internal fixation."[8] Perkins was placed in an equalizer boot, and upon follow-up on June 10, 2003, Dr. MacMenamin noted "satisfactory position and alignment" and inversion of five degrees and eversion of five degrees. Perkins was ordered to discontinue using the equalizer boot and was shown exercises for "increased range of motion in inversion/eversion, dorisflexion and plantar flexion." Although the record notes that Dr. MacMenamin expected to see Perkins again in three weeks, no records indicate that Perkins returned, and the clinic's efforts to reach him were unsuccessful.[9]

As part of Perkins' disability case, Dr. Robin Epp performed a consultative examination of Perkins on March 2, 2011 and provided the Disability Determination Services - State of Iowa with a report of her opinions regarding Perkins' functional ability due to pain in his left knee and low back and fainting spells. During the examination, Perkins rated pain in his back, allegedly first sustained due to high school football activity, as 8 out of 10, with standing or sitting increasing the pain and a warm bath, heating patches, and ibuprofen decreasing the pain. Perkins rated his left knee pain, as related to his fractured heel, as 9 out of 10, with walking or standing increasing the pain and being off his feet as decreasing the pain. Dr. Epp also discussed Perkins' left knee, as related to his truck accident and ACL repair surgery. Perkins rated this pain 8 out of 10, with stairs, standing, or walking increasing the pain and ibuprofen and a brace decreasing the pain.[10] Finally, Dr. Epp's report notes that Perkins had experienced four fainting spells, with the most recent at the time of examination happening while he was riding his bike

---

[8] Administrative Record at 315-322.

[9] Administrative Record at 321-322.

[10] It is unclear if the report separates the analyses of these left knee injuries separately by mistake or with purpose.

four months before the examination. Perkins said that he was unsure what was causing the fainting spells.[11]

Perkins additionally provided Dr. Epp with description of his daily abilities and limitations. Dr. Epp writes:

> [Perkins] has problems with self-care and personal hygiene activities such as with bathing and with sensory function such as with feeling with his fingers. He also has difficulties with physical activities and non-specified hand activities such as standing, sitting, reclining, walking, climbing stairs, lifting, pushing and pulling and gripping and grasping. Mr. Perkins relates difficulties with riding in a car and with sexual function.

(Administrative Record at 325.) Dr. Epp also noted that Perkins uses a cane when pain is severe.[12]

Upon further physical examination, Dr. Epp made a series of conclusions regarding Perkins' limitations. Dr. Epp opined that Perkins' physical examination "reveal[ed] a well-developed, well-nourished male in no apparent distress at the time of examination. No difficulties were reported during the examination." The heent, neurologic, cardiopulmonary, and abdomen portions of the examination all showed normal results.[13]

In the musculoskeletal portion of the examination, Dr. Epp noted Perkins

> [D]id limp due to left knee pain while ambulating. He was able to heel and toe walk without difficulties and was able to squat without difficulty. He was able to get on and off the examination table without difficulty. No costovertebral angle tenderness was noted. No percussive tenderness was noted.

---

[11] Administrative Record at 324.

[12] Administrative Record at 325.

[13] Administrative Record at 326.

(Administrative Record at 326.) Dr. Epp went on to refer to a range of motion worksheet, referring to Perkins' muscle strength. The worksheet noted that Perkins showed a "slow gait due to left knee pain" and twenty degrees diminished flexion of the lumbar spine.[14] Dr. Epp further recorded that Perkins showed a positive seated leg raising and straight leg raising on his left side, "joint line tenderness was noted on the left," and "anterior knee pain was noted on the left as well."[15]

Dr. Epp concluded that due to Perkins' left heel and knee pain, he was limited to lifting, pushing and pulling thirty pounds from floor to waist, over-the-shoulder rarely, and from waist to shoulder occasionally. Dr. Epp found that Perkins could sit occasionally and stand, walk, stoop, and bend rarely. Perkins could not crawl, kneel or be on uneven surfaces and ladders. He could rarely use stairs and could occasionally use his lower extremity. Dr. Epp noted that there were no restrictions on Perkins' upper extremity and grip/grasp. He also reported that Perkins could not use vibratory or power tools or work in warm/cold temperatures due to his low back pain.[16] The next month, x-rays of Perkins' left knee confirmed mild to moderate secondary osteoarthritis, and x-rays of the lumbar spine established multilevel mild to moderate degenerative change, greatest at L4-S1.[17]

After the consultative examination, Perkins continued to experience fainting spells (syncopal episodes) and sought consultation from various treating physicians regarding the cause. On June 27, 2011, Dr. Scott Piper of Linn Community Care recommended Perkins for several tests, his notes indicating that if initial tests were normal, Perkins would need to proceed to cardiology for further testing. Perkins underwent EKG testing and chest

---

[14] Administrative Record at 331.

[15] Administrative Record at 327.

[16] Administrative Record at 328.

[17] Administrative Record at 355-356.

x-rays, and both returned normal results.[18] Again on July 25, 2011, Perkins returned for follow-up examination, his records noting that he had not experienced any new episodes since his last appointment, but that he continued to experience low back and left knee pain. A cause for his syncope had not yet been determined. Dr. Robert Beck's records indicate Perkins had lumbar para spinal muscle spasm, returned a positive McMurray's sign on his left knee, and showed elevated creatinine in his blood results. Dr. Beck recommended Perkins consult cardiology regarding his syncope because preliminary tests returned normal and prescribed him pain pills for his knee and back pain. Dr. Beck also urged Perkins to apply for Iowa Care insurance to ensure he could continue to obtain medical treatment.[19] On August 8, 2011, Perkins was ordered to wear a Holter heart monitor for 24 hours to determine the cause of syncope; however, the monitor also returned normal results.[20] Perkins returned to Linn Community Care on August 29, 2011, where Dr. Yue Teng prescribed him medication for knee and back pain, and recommended he make an appointment with a primary clinic accepting Iowa Care. Because the Holter monitor came back normal, Dr. Teng recommended Perkins see a neurologist for further evaluation.[21]

The record indicates that Perkins did not see a treating physician again until May 29, 2012, although he continued to refill his pain prescriptions at a free clinic.[22] When he did consult a treating physician again, Perkins reported suffering from syncopal episodes and back pain. Dr. Glenn Abernathy at The University of Iowa Hospitals and Clinics ran various lab tests; however, all of the lab tests, including EKG testing, showed

---

[18] Administrative Record at 373-376.

[19] Administrative Record at 368-370.

[20] Administrative Record at 356-358.

[21] Administrative Record at 365.

[22] Administrative Record at 378.

values in the "normal range" and "look[ed] very good." Dr. Abernathy's notes indicate Perkins was diagnosed with hypertension. Perkins' pain prescriptions were also refilled. Dr. Abernathy recommended that if Perkins started to have another fainting spell again he "lie down immediately and see if that does not take care of the problem."[23] Another appointment was schedule two days before the hearing, and when asked about it by the ALJ, Perkins testified that it was "more or less of a follow up," and another appointment had been scheduled for December.[24]

## V. CONCLUSIONS OF LAW

### A. ALJ's Disability Determination

The ALJ determined that Perkins is not disabled. In making this determination, the ALJ was required to complete the five-step sequential test provided in the social security regulations. *See* 20 C.F.R. §§ 404.1520(a)-(g), 416.920(a)-(g); *Bowen v. Yuckert*, 482 U.S. 137, 140-42 (1987); *McCoy v. Astrue*, 648 F.3d 605, 611 (8th Cir. 2011); *Page v. Astrue*, 484 F.3d 1040, 1042 (8th Cir. 2007). The five steps an ALJ must consider are:

> (1) whether the claimant is gainfully employed, (2) whether the claimant has a severe impairment, (3) whether the impairment meets the criteria of any Social Security Income listings, (4) whether the impairment prevents the claimant from performing past relevant work, and (5) whether the impairment necessarily prevents the claimant from doing any other work.

*Goff v. Barnhart*, 421 F.3d 785, 790 (8th Cir. 2005) (citing *Eichelberger*, 390 F.3d at 590); *Perks*, 687 F.3d at 1091-92 (discussing the five-step sequential evaluation process); *Medhaug v. Astrue*, 578 F.3d 805, 813-14 (8th Cir. 2009) (same); *see also* 20 C.F.R. §§ 404.1520(a)-(g), 416.920(a)-(g). "If a claimant fails to meet the criteria at any step in the evaluation of disability, the process ends and the claimant is determined to be not

---

[23] Administrative Record at 350-354.

[24] Administrative Record at 58.

disabled." *Pelkey v. Barnhart*, 433 F.3d 575, 577 (8th Cir. 2006) (citing *Goff*, 421 F.3d at 790, in turn quoting *Eichelberger*, 390 F.3d at 590-91).

In considering the steps in the five-step process, the ALJ:

> first determines if the claimant engaged in substantial gainful activity. If so, the claimant is not disabled. Second, the ALJ determines whether the claimant has a severe medical impairment that has lasted, or is expected to last, at least 12 months. Third, the ALJ considers the severity of the impairment, specifically whether it meets or equals one of the listed impairments. If the ALJ finds a severe impairment that meets the duration requirement, and meets or equals a listed impairment, then the claimant is disabled. However, the fourth step asks whether the claimant has the residual functional capacity to do past relevant work. If so, the claimant is not disabled. Fifth, the ALJ determines whether the claimant can perform other jobs in the economy. If so, the claimant is not disabled.

*Kluesner v. Astrue*, 607 F.3d 533, 537 (8th Cir. 2010). At the fourth step, the claimant "bears the burden of demonstrating an inability to return to [his] or her past relevant work." *Pate-Fires v. Astrue*, 564 F.3d 935, 942 (8th Cir. 2009) (citing *Steed v. Astrue*, 524 F.3d 872, 875 n.3 (8th Cir. 2008)). If the claimant meets this burden, the burden shifts to the Commissioner at step five to demonstrate that "given [the claimant's] RFC [(residual functional capacity)], age, education, and work experience, there [are] a significant number of other jobs in the national economy that [the claimant] could perform." *Brock*, 674 F.3d at 1064 (citing *Ellis v. Barnhart*, 392 F.3d 988, 993 (8th Cir. 2005)). The RFC is the most an individual can do despite the combined effect of all of his or her credible limitations. 20 C.F.R. § 416.945. The ALJ bears the responsibility for determining "'a claimant's RFC based on all the relevant evidence including the medical records, observations of treating physicians and others, and an individual's own description of his [or her] limitations.'" *Boettcher v. Astrue*, 652 F.3d 860, 867 (8th Cir. 2011) (quoting *Moore*, 572 F.3d at 523); 20 C.F.R. §§ 404.1545, 416.945.

The ALJ applied the first step of the analysis and determined that Perkins had not engaged in substantial gainful activity since December 31, 2008, the date of his alleged onset of disability. At the second step, the ALJ concluded from the medical evidence that Perkins had the following severe impairments: a history of an injury to the left anterior cruciate ligament with osteoarthritis, hypertension with occasional syncopal episodes, and degenerative lumbar disc disease. The ALJ did not find Perkins' heel fracture, dermatitis or obesity severe.[25] At the third step, the ALJ found that Perkins does not have an impairment or combination of impairments listed in 20 C.F.R. Pt. 404, Subpt. P, App. 1. At the fourth step, the ALJ determined Perkins' RFC as follows:

> [Perkins] has the residual functional capacity to perform a range of medium work as defined in 20 C.F.R. § 404.156(7)(c) and § 416.967(c). [He] can lift and/or carry and push and/or pull twenty-five pounds occasionally, twenty pounds frequently. He can stand and/or walk, with normal breaks, for a total six hours in a workday. He can sit, with normal breaks, for a total of six hours in a workday. [He] can balance, crouch, stoop, kneel, crawl, and climb occasionally. He cannot work at unprotected heights or around hazards. The claimant cannot use foot controls. He cannot work in temperature extremes.

(Administrative Record at 20.) Also at the fourth step, the ALJ determined that Perkins could not perform any past relevant work as an assembler, a material handler, a hand packager, a packaging machine operator, or a wire harness assembler, as all past relevant work requires exertion at medium level or greater. At the fifth step, the ALJ determined that given Perkins' age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that he can perform. Consequently, the ALJ determined that Perkins has not been under disability, as defined in the Social Security Act.

---

[25] Administrative Record at 19.

### B. Objections Raised by Claimant

Perkins contends that the ALJ erred in her disability assessment in two regards. First, Perkins claims that the ALJ inaccurately evaluated the credibility of his subjective allegations. Second, Perkins claims that the ALJ failed to provide adequate reasoning to support her decision to discount consultative examiner Dr. Robin Epp's opinions regarding Perkins' work-related limitations; limitations Perkins claims are well-supported by objective medical evidence.

### 1. Credibility Determination

Perkins argues that the ALJ inaccurately assessed his credibility by failing to adequately consider contrary objective medical evidence, subsequently resulting in a skewed analysis of Dr. Robin Epp's opinion of Perkins' limitations. In addition, Perkins claims that the ALJ failed to consider Perkins' inability to afford medical treatment in assessing the frequency with which he sought medical care. Finally, Perkins claims that the ALJ inaccurately perceived the extent of his limited daily activities. The Commissioner argues that the ALJ properly evaluated Perkins' credibility, taking his testimony and the whole of the record into consideration in her determination.

When assessing a claimant's credibility, "[t]he adjudicator must give full consideration to all the evidence presented relating to subjective complaints, including the claimant's prior work record, and observations by third parties and treating and examining physicians relating to such matters as: (1) the claimant's daily activities; (2) the duration, frequency, and intensity of the pain; (3) precipitating and aggravating factors; (4) dosage, effectiveness and side effects of medication; [and] (5) functional restrictions." *Polaski v. Heckler*, 739 F.2d 1320, 1322 (8th Cir. 1984). An adjudicator (ALJ) should also consider a "a claimant's work history and the absence of objective medical evidence to support the claimant's complaints[.]" *Finch v. Astrue*, 547 F.3d 933, 935 (8th Cir. 2008) (citing *Wheeler v. Apfel*, 224 F.3d 891, 895 (8th Cir. 2000)). The ALJ, however, may not

disregard a claimant's subjective complaints "'solely because the objective medical evidence does not fully support them.'" *Renstrom v. Astrue*, 680 F.3d 1057, 1066 (8th Cir. 2012) (quoting *Wiese v. Astrue*, 552 F.3d 728, 733 (8th Cir. 2009)).

Instead, an ALJ may discount a claimant's subjective complaints "if there are inconsistencies in the record as a whole." *Wildman*, 596 F.3d at 968; *see also Finch*, 547 F.3d at 935 (same); *Lowe v. Apfel*, 226 F.3d 969, 972 (8th Cir. 2000) ("The ALJ may not discount a claimant's complaints solely because they are not fully supported by the objective medical evidence, but the complaints may be discounted based on inconsistencies in the record as a whole."). If an ALJ discounts a claimant's subjective complaints, he or she is required to "'make an express credibility determination, detailing the reasons for discounting the testimony, setting forth the inconsistencies, and discussing the Polaski factors.'" *Renstrom*, 680 F.3d at 1066 (quoting *Dipple v. Astrue*, 601 F.3d 833, 837 (8th Cir. 2010)); *see also Ford*, 518 F.3d at 982 (An ALJ is "required to 'detail the reasons for discrediting the testimony and set forth the inconsistencies found.' *Lewis v. Barnhart*, 353 F.3d 642, 647 (8th Cir. 2003)."). Where an ALJ seriously considers, yet discredits a claimant's subjective complaints, the Court will not disturb the ALJ's credibility determination if good reason is provided. *Johnson v. Apfel*, 240 F.3d 1145, 1148 (8th Cir. 2001) (citing *Pena v. Chater*, 76 F.3d 906, 908 (8th Cir. 1996)); *see also Schultz v. Astrue*, 479 F.3d 979, 983 (8th Cir. 2007) (providing that deference is given to an ALJ when the ALJ explicitly discredits a claimant's testimony and gives good reason for doing so); *Gregg v. Barnhart*, 354 F.3d 710, 714 (8th Cir. 2003) ("If an ALJ explicitly discredits the claimant's testimony and gives good reasons for doing so, we will normally defer to the ALJ's credibility determination."). "'The credibility of a claimant's subjective testimony is primarily for the ALJ to decide, not the courts.'" *Vossen v. Astrue*, 612 F.3d 1011, 1017 (8th Cir. 2010) (quoting *Pearsall v. Massanari*, 274 F.3d 1211, 1218 (8th Cir. 2001)).

In making her decision, the ALJ followed the two-step analysis required when making a credibility assessment, as set out by Social Security Ruling 96-7p.[26] The ALJ adequately applied the law first by determining that Perkins has a medically determinable impairment, and then second, by analyzing the intensity, persistence and limiting effects of Perkins' pain to determine the extent it limits his basic work ability. It is clear from the ALJ's decision that she thoroughly considered and discussed Perkins' treatment history, medical history, functional restrictions, effectiveness of medications, activities of daily living, and work history in making the credibility determination.

In her explanation, the ALJ discussed each of Perkins' conditions in detail, noting whether his pain intensity was substantiated by objective medical evidence, and if it was not, whether it was substantiated by any of the *Polaski* factors. The Court finds that the ALJ's analysis is satisfactory, as it provides more explanation than merely listing inconsistencies with objective medical evidence. *See Renstrom v. Astrue*, 680 F.3d 1057, 1066 (8th Cir. 2012) ("[A]n ALJ may not discount a claimant's subjective complaints solely because the objective medical evidence does not fully support them.") (citing *Weise v. Astrue*, 552 F.3d 728, 733 (8th Cir. 2009).

The ALJ found that a compilation of *Polaski* factors justified her analysis that Perkins' heel injury was not a severe impairment. First, although Perkins claims his heel pain has started to affect his left knee, the ALJ notes that his heel fracture mended within two months, and he failed to return to the doctor for a follow-up appointment. In addition, Perkins first injured his heel in 2003, considerably before the onset date of his alleged disability in 2008. Since sustaining the injury, he returned to work, performing various types of manual labor.[27]

---

[26] Administrative Record at 20-21.

[27] Administrative Record at 21.

Likewise, in considering Perkins's left knee difficulties, the ALJ found that since Perkins' successful recovery from knee surgery in 1996, his medical records show sparse and sporadic reference to knee issues. The ALJ notes that for over fifteen years, Perkins was able to work without a decrease in earnings. The ALJ acknowledged the consultative examiner's findings that Perkins "achieved only 130 of 150 degrees of left knee flexion and had a slow gait (Exhibit 5F, pages 8-9)," but found "[t]hese observations, though, do not suggest the claimant would be unable to perform the work as described in the above-listed residual functional capacity assessment."[28]

With regards to Perkins' back pain, the ALJ found that objective medical evidence from testing and examination and few records of medical treatment discredit Perkins' reported severity of pain. Although consultative x-rays from 2011 indicate degenerative disc disease, the ALJ noted that the consultative examiner found Perkins only suffered from a minor loss of range of motion. These objective findings supplement a lack of evidence from Perkins' medical records, which indicate he sought little medical treatment and no physical therapy specific to his back pain.[29]

Finally, in considering Perkins' syncopal episodes, the ALJ found that all tests conducted with regards to his fainting spells have returned normal results. Although Perkins has been diagnosed with hypertension, no cause for his syncopal episodes has been established. While the ALJ notes that Perkins is not able to fully exert himself, she finds no reason why he cannot exert himself at the levels indicated in the RFC assessment.[30]

Perkins argues that the ALJ failed to take his inability to afford treatment into consideration when using his sporadic treatment as a factor in determining his credibility.

---

[28] Administrative Record at 22.

[29] Administrative Record at 23.

[30] Administrative Record at 23.

The Court notes, "[i]t is for the ALJ in the first instance to determine a claimant's real motivation for failing to follow prescribed treatment or seek medical attention." *Whitman v. Colvin*, 762 F.3d 701, 706 (8th Cir. 2014) (citing *Hutsell v. Sullivan*, 892 F.2d 747, 750 (8th Cir. 1989)). "The fact that [the claimant] is under financial strain is not determinative." *Id.* (citing *Murphy v. Sullivan*, 953 F.2d 383, 386 (8th Cir. 1992)).

The facts here are unpersuasive. Perkins was encouraged by his physician to apply for Iowa Care; he did so and was later approved. Subsequent medical records show that he was able to obtain prescriptions, have them refilled, and make appointments with facilities accepting Iowa Care. Nothing else on the record indicates that Perkins had difficulty making doctors appointments or that any physicians denied him treatment. *See Murphy* 953 F.2d at 386 (finding the fact that the plaintiff was never denied medical care indicated an ability to obtain treatment if needed.).

In addition, Perkins rated his pain 8 and 9.5 out of 10. It is reasonable that an individual experiencing such severe pain would seek out regular medical care, regardless of expense. Consequently, Perkins' failure to diligently seek medical treatment shows an inconsistency with the severity of pain he reports, diminishing his credibility. *See generally Dukes v. Barnhart*, 436 F.3d 923, 928 (8th Cir. 2006); *Singh v. Apfel*, 222 F.3d 448, 453 (8th Cir. 2000) ("A claimant's allegation of disabling pain may be discredited by evidence that claimant has received minimal medical treatment and/or has taken only occasional pain medications."). Thus, the Court finds that the ALJ did not err in taking Perkins' sporadic medical treatment into consideration when determining inconsistencies in his subjective allegations of pain.

Perkins also argues that the ALJ erred by failing to take the whole of the record into consideration when determining the extent of his daily activities. The ALJ acknowledged Perkins' daily activities in her determination, noting the fact that Perkins is able to cook two to three times a week, do chores, walk, bike, attend church, and go to the grocery

store/movies. The ALJ concluded this indicates a "range of activity consistent with someone who is able to be on his feet for periods longer than that associated with sedentary work."[31]

The Court recognizes that these types of activities, alone, are not indicative of Perkins' ability to work; however, when taken in consideration with objective medical information on the record and Perkins' credibility regarding his subjective allegations, these limitations are less persuasive. While the Court acknowledges that Perkins suffers symptoms that make him unable to perform various tasks he once was able to perform, it also notes that the ALJ adequately took these limitations into consideration when weighing all evidence on record. In fact, the ALJ found that Perkins could not hold occupations he once did, restricting him to only work requiring light exertion. This shows the ALJ took Perkins' limitations into consideration when determining his RFC.

The ALJ concluded that:

> After careful consideration of the evidence, the Administrative Law Judge finds that the claimant's medically determinable impairments reasonably could be expected to cause some of the alleged symptoms. The claimant's statements concerning the intensity, persistence, and limiting effects of these symptoms are not credible to the extent they are inconsistent with the above residual capacity assessment.
>
> Despite the extent of limitation alleged by the claimant, the Administrative Law Judge finds that the submitted documentation indicates such limited, remote treatment, a return to work is merited at levels consistent with that of before the accident causing his current alleged limitations, and functional observations consistent with the work described in the above-listed residual functional capacity assessment. Taken together, those factors undermine the claimant subjective complaints such that no further limitations can be justified by the weight of the evidence.

---

[31] Administrative Record at 24.

(Administrative Record at 24.)

Having reviewed the entire record, the Court finds that the ALJ adequately considered and addressed the *Polaski* factors in determining that Perkins' subjective allegations of disability were not credible. *See Johnson*, 240 F.3d at 1148; *see also Goff*, 421 F.3d at 791 (an ALJ is not required to explicitly discuss each *Polaski* factor, it is sufficient if the ALJ acknowledges and considers those factors before discounting a claimant's subjective complaints); *Tucker v. Barnhart*, 363 F.3d 781, 783 (8th Cir. 2004) ("The ALJ is not required to discuss each *Polaski* factor as long as the analytical framework is recognized and considered. *Brown v. Chater*, 87 F.3d 963, 966 (8th Cir. 1996)."). Thus, as the ALJ seriously considered, but for good reasons explicitly discredited Perkins' subjective complaints, the Court finds the ALJ's credibility determination plausible. *See Johnson*, 240 F.3d at 1148. Even if inconsistent conclusions could be drawn on this issue, the Court upholds the conclusions of the ALJ because they are supported by substantial evidence on the record as a whole. *Guilliams*, 393 F.3d at 801.

### 2. *Opinion of Consultative Examiner, Dr. Robin Epp*

Additionally, Perkins contends that the ALJ erred by failing to consider Dr. Robin Epp's work limitations analysis. Specifically, Perkins claims that the ALJ failed to provide adequate reasoning in support of her decision not to rely on Dr. Epp's opinion when strong objective evidence supported Dr. Epp's conclusions regarding Perkins' limitations. Consequently, Perkins contends the ALJ's failure to consider Epp's opinion resulted in an improper determination of Perkins' RFC and, subsequently, the vocational expert's assessment of the occupations an individual with Perkins' limitations is able to perform. Because the vocational expert found that a person with Perkins' limitations would be able

to perform certain jobs, Perkins argues, "[t]he difference between Dr. Epp's conclusions and the ALJ's residual functional capacity assessment, then, are material."[32]

The ALJ is responsible for determining the claimant's RFC based on all relevant evidence on the record. *Roberts v. Apfel*, 222 F.3d 466, 469 (8th Cir. 2000). In assessing all relevant evidence on record, the ALJ is required to evaluate every medical opinion he or she receives from a claimant. 20 C.F.R. § 404.1527(c). If the medical opinion is not from a treating source, as is the case here, then the ALJ considers the following factors in determining the weight to be given to the non-treating medical opinion: "(1) examining relationship, (2) treating relationship, (3) supportability, (4) consistency, (5) specialization, and (6) other factors." *Wiese v. Astrue*, 552 F.3d 728, 731 (8th Cir. 2009) (citing 20 C.F.R. §§ 404.1527(c)). Should a medical opinion clash with other factors on the record, then, the ALJ must resolve such conflicts. *see Wagner v. Astrue*, 499 F.3d 842, 848 (8th Cir. 2007). "The ALJ may discount or disregard such an opinion if other medical assessments are supported by superior medical evidence, or if the treating physician has offered inconsistent opinions." *Id.*; *see also Travis*, 477 F.3d at 1041 ("A physician's statement that is 'not supported by diagnoses based on objective evidence' will not support a finding of disability. *Edwards v. Barnhart*, 314 F.3d 964, 967 (8th Cir. 2003).

Here, the ALJ justified discounting Dr. Epp's analysis of the severity of Perkins' limitations due to its inconsistency with the record, stating:

> While the Administrative Law Judge acknowledges the opinion of the consultative examiner concerning the claimant's additional limitations, the Administrative Law Judge finds these restrictions were based more on the claimant's subjective reports, rather than findings on examination. As previously noted, the claimant had minimal range of motion deficits. Additionally, he had full lower and upper extremity strength (Exhibit 5F, pages 8-9). This seems inconsistent with an

---

[32] Perkins' Brief (docket number 13 at 9).

> assertion that the claimant can stand or walk only rarely,
> especially given his sparse treatment and the lack of supportive
> laboratory data (Exhibit 5, page 5). As such, the opinion of
> the consultative examiner that the claimant requires additional
> limitations is given little weight.

(Administrative Record at 25.) Because the ALJ found Perkins' subjective complaints lacking sufficient credibility under the *Polaski* standard, she found reason to give Dr. Epp's analysis little weight in her final determination of the RFC, giving more weight to other objective evidence from Dr. Epp's examination of Perkins, medical records provided by other treating physicians, and findings provided by state agency physicians.

As noted, it is not the Court's role to re-weigh evidence on record but to determine whether substantial evidence supports the ALJ's final determination. *Clay* 417 F.3d 922,928. While arguably the ALJ provided little explanation as to why Dr. Epp's analysis relies more on the claimant's "subjective reports, than findings on examination," the ALJ did provide reasoning to support her conclusion that the record, as a whole, contradicted Epp's final analysis. Thus, it is not the role of the Court to analyze whether substantial evidence supports a contrary analysis; rather, it is the Court's role to determine whether the ALJ relied on substantial evidence in making her decision.

Dr. Epp's report credits Perkins' subjective complaints as a factor in determining her overall analysis, stating:

> The opinions given are based upon the available information
> at this time, including the history given by the examinee, the
> medical records and tests provided, and the physical findings.
> It is assumed that the information provided to me is correct.

> Comments regarding functional ability are this examiner's
> opinions based on observations during examination, the
> examinee's history, general health, and expected activity levels
> or tolerance as a result of the specified condition. Work
> activity levels and strength capability are also a factor of the
> individual's body habitus, level of conditioning, and

> motivation. If necessary, functional testing may help define an
> individual activity level and tolerance.

(Administrative Record at 328.)

As established in *V.B.1*, Perkins' subjective complaints regarding the intensity, persistence, and limiting effects of his symptoms lack credibility. Though Perkins claims his knee pain is 9.5 out of 10 and his back pain is 8 out of 10, his medical records show less than regular treatment since he claims his disability began in 2008. Further, medical records since December 2008 indicate that his appointments have largely concerned his syncopal episodes with only a reference to continued knee and back pain, for which he obtains pain medication. While the ALJ acknowledges the likelihood of Perkins' symptoms, she still finds Perkins' reported severity of symptoms inconsistent with the whole of the record. The ALJ supports this assertion not only with her interpretation of the objective medical evidence on record, as discussed, but also in conjunction with the opinions of non-examining state agency physicians. The Court agrees with this analysis. Consequently, at least some factors Dr. Epp took into consideration in finalizing her report lacked sufficient credibility and justify the ALJ's decision to give it less weight.

Because the ALJ found that the opinions of state agency physicians were supported by evidence on the record, she did not err by relying, in part, on their analysis. *See Casey v. Astrue*, 503 F.3d 687,694 (8th Cir. 2007) (The court found that the ALJ adequately took state-agency doctor's opinions into consideration, because they supported the whole of the record.) Non-examining state agency doctor Jan Hunter reviewed Perkins' medical records and Dr. Epp's analysis April 21, 2011. Dr. John May reviewed Perkins' records July 6, 2011.[33] In reviewing Perkins' medical history, Dr. Hunter found Perkins' subjective allegations to be "partially credible," asserting "while the claimant indicates that he is significantly limited in performing his daily activities the objective medical findings do not

---

[33] Administrative Record at 66-87, referencing Exhibits 1-6A.

support this level of limitation." Dr. Hunter found Perkins to be limited to lifting and or carrying 25 pounds, frequently lifting and or carrying 20 pounds and standing, walking, and sitting 6 to 8 hours workdays. Hunter also found Perkins could occasionally climb, balance, stoop, kneel, crouch, and crawl.[34] Because the ALJ found this analysis to be consistent with most evidence on record, the Court does not find she erred in taking it into consideration when determining Perkins' RFC, even though it differed from Dr. Epp's final limitations analysis.

The Court also finds that the ALJ did not fail to adequately consider Dr. Epp's opinion in light of contradictory evidence. On the contrary, the ALJ took Dr. Epp's report into consideration when determining Perkins' range of mobility, referencing Dr. Epp's finding that Perkins had full lower and upper extremity strength and a twenty degree decrease in mobility in his lumbar spine.[35] The fact that the ALJ cited Dr. Epp's report shows that she fully and adequately assessed the information provided and found the mobility report to be largely inconsistent with Dr. Epp's opinion of Perkins' limitations.

Additionally, in his brief, the Plaintiff stresses that by failing to address a positive McMurray's test and positive response to a straight leg raising test, the ALJ failed to adequately weigh factors relevant to her final determination. The Court considers this argument. However, as discussed, the ALJ showed there is substantial evidence in justification of her final decision. Just because the ALJ did not discuss these other items does not mean she did not consider them in her evaluation of the record as a whole. As noted, as long as "there is substantial evidence to support the [ALJ's] conclusion, we may not reverse even though there may also be substantial evidence to support the opposite conclusion." *Clay* 417 F.3d at, 928. The Court concludes there is no merit to Perkins' argument on this issue.

---

[34] Administrative Record at 72-73.

[35] Administrative Record at 25, referencing pg. 330-331 Exhibit 5F

## VI. CONCLUSION

The Court finds that the ALJ properly considered and addressed the medical evidence and opinions in the record, including the opinions of Dr. Robin Epp, the consultative examiner. The Court also finds that the ALJ properly determined Perkins' credibility with regard to his subjective complaints of disability. Accordingly, the Court determines that the ALJ's decision is supported by substantial evidence and shall be affirmed.

## VII. ORDER

1. The final decision of the Commissioner of Social Security is **AFFIRMED**;

2. Plaintiff's Complaint (docket number 3) is **DISMISSED** with prejudice; and

3. The Clerk of Court is directed to enter judgment accordingly.

DATED this __17th__ day of July, 2015.

JON STUART SCOLES
CHIEF MAGISTRATE JUDGE
NORTHERN DISTRICT OF IOWA